# IN THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE | : CHAPTER 7 |
| COVENANT PARTNERS, L.P. | : |
| DEBTOR | : BANKRUPTCY NO. 14-17568 |
| GARY F. SEITZ, TRUSTEE | : |
| PLAINTIFF | : |
| V. | : |
| PETER FRORER, ET AL | : |
| DEFENDANTS | : ADV. NO. 14-685 |

# OPINION

BY: STEPHEN RASLAVICH, UNITED STATES BANKRUPTCY JUDGE.

*Introduction*

　　Gary F. Seitz, Trustee of the above-captioned estate, has filed a Motion under Rule 9019 to Approve a Compromise of this adversary proceeding with Defendants, Peter Frorer, Frorer Partners, L.P., Frorer Associates, LLC, FCF Credit, Inc., and Tripartite, LLC. The Motion is opposed by William B. Fretz, John P. Freeman, and certain other individuals they purport to represent. A hearing on the Motion was held July 20, 2016. The Court thereafter took the matter under advisement. For the reasons which follow, the Motion will be granted.[1]

---

[1] Because this matter pertains to avoidance and recovery of preferential or fraudulent transfers, it is within this Court's "core" jurisdiction. *See* 28 U.S.C. § 157(b)(2)(F), (H) (including among core proceedings such causes of action)

The dispute which is the subject of the lawsuit concerns the Debtor's principal asset, 8 million shares of stock in a company called Pet360. *See* Complaint, generally. The Debtor was a private equity fund which had acquired that stock for its portfolio. *See* Debtor's Bankruptcy Schedule B. Its troubles began in 2009 when the Attorney General filed suit against the Debtor and its Principals alleging mishandling of investors' funds. Statement of Financial Affairs, ¶ 4. By 2011, the litigation had become protracted and defense costs had mounted. Complaint ¶ 25. The Principals turned to another hedge fund manager, Defendant Peter Frorer, for financial help. *Id.* Frorer made loans to the Debtor and to the Principals. Ex. T-1

In 2012, Frorer's fund was the subject of an audit. Complaint ¶ 33. To meet his auditors' requirements, he asked the Principals to either repay the loans or to post collateral to secure them. *Id.* After a year of demands, the Principals transferred 5 million shares of the Pet360 stock to Frorer as a pledge. Ex. T-4.

Unsatisfied with that amount of the Pet360 stock, Frorer devised a plan to obtain the remainder of the Debtor's position. ¶ 122. The Attorney General's lawsuit resulted in a $2.5 million judgment against the Debtor and the Principals. Ex. T-5; SoFA, ¶ 4. Frorer formed an entity (Defendant Tripartite LLC) to acquire that judgment from the Commonwealth and to attach more Pet360 stock. Tripartite purchased the judgment at a discount and commenced execution proceedings in Montgomery County. See Tripartite's Motion for Relief from Stay. Pursuant to court order, the Principals delivered 3 million shares of Pet360 stock to the Prothonotary where it was placed in escrow *Id.* ¶ The Debtor's bankruptcy filing kept those shares from being turned over to Frorer.

Less than three weeks into the bankruptcy case, the Defendants sought relief

2

from stay to resume execution on the writ and to attach the Pet360 shares. *Id.* The Trustee opposed that request and the Court ultimately denied it. *See* Trustee's Response; Order Dated October 29, 2014. In December 2014, the Trustee filed this adversary proceeding seeking to recover the 5 million shares that had been transferred to Frorer prepetition and the shares on deposit with the Prothonotary.

*The Settlement*

The Trustee's action was brought to avoid and recover certain prepetition transfers of stock. The Defendants filed answers to the Trustee's complaint. The parties have now reached a global resolution of the dispute. Under their Settlement Agreement, the Defendants (or entities holding stock) will return the stock or the proceeds thereof. In exchange, three of the Defendants shall be allowed claims as more fully specified in the agreement.

*Applicable Standard*

Under Bankruptcy Rule 9019, the Court has authority to approve a compromise of a claim, provided the debtor, trustee and creditors are given twenty days' notice of the hearing on approval of the compromise or settlement. *See* B.R. 2002(a)(3), 9019(a). Approval of the settlement lies within the sound discretion of the Bankruptcy Court. *In re Neshaminy Office Bldg. Assocs.,* 62 B.R. 798, 803 (E.D.Pa.1986) In deciding whether to approve a settlement, the Court must determine whether the proposed settlement is in the best interests of the estate. *Id.* The Third Circuit has held that this particular process of bankruptcy court approval requires the Court to assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal. *See In re Martin,* 91 F.3d 389, 393 (3d Cir.1996).

Consistent with *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424–25, 88 S.Ct. 1157, 1163–64, 20 L.Ed.2d 1 (1968), the Third Circuit recognizes four criteria a court should consider in striking this balance: (1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, along with the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of creditors. *See Martin, supra; see also Will v. Northwestern University (In re Nutraquest, Inc.),* 434 F.3d 639, 645 (3d Cir.2006) (reaffirming *Martin* factors for approval of settlements). When considering the relevant factors courts are admonished to avoid second-guessing the Trustee in the exercise of his or her business judgment, and instead endeavor to ascertain whether the terms of the proposed settlement fall below the lowest range of reasonableness. *See Neshaminy, supra* at 803. As the proponent of a settlement, the Trustee bears the burden of proof. *See In re Glickman Berkovitz, Levinson & Weiner,* 204 B.R. 450, 455 (E.D.Pa.1997).

*Probability of Success*

In assessing his chances at trial, Trustee's counsel stated that they considered their case generally to be a strong one. Oral Testimony (OT-) 1:41.[2] A possible weakness mentioned had to do with the circumstances surrounding transfer of the stock: it was done voluntarily. OT-1:38. It was felt that this might render the Trustee's causes of action vulnerable to an *in pari delicto* challenge.[3] *Id.*

---

[2] Oral testimony at the July 20 hearing commenced at 1:31 p.m. and concluded at 2:59 p.m.

[3] "*In pari delicto*" refers to an equitable defense which implicates standing. *Official Comm. Unsec. Cr. v. Lafferty*, 267 F.3d 340, 351 (3d Cir. 2001) It provides that a plaintiff may not assert a claim if the plaintiff bears fault for the claim. *Id.* Application of the *in pari delicto* doctrine is affected by the rules of bankruptcy procedure. *Id.* at 356. Those rules authorize the Trustee to "commence and prosecute any action or proceeding in behalf of the estate before any tribunal." Fed. R. Bankr.P. 6009. "Such actions ... fall into two categories: (1) those brought by the trustee as successor to the debtor's interest included in the

This concern, however, is largely moot, given that under the settlement the estate will receive an amount equal or close to the demand in the complaint. In total, the estate will recover at least $7 million and perhaps up to $7.2 million depending on litigation pending in another district. OT-1:41. In counsel's words, this was "a terrific settlement" as the outcome is "all that he could have hoped for." OT-1:40

*Paramount Interest of Creditors*

Risking that to obtain a marginally better result at trial was viewed as imprudent. A vigorous defense was to be expected and given the complexities attending cases involving securities (e.g., valuation) an outcome could take years. OT-1:42. Also factoring into the Trustee's calculus was the likelihood of an appeal were judgment entered in his favor.[4] *Id.* By settling now on such favorable terms, the estate's creditors will clearly be getting an immediate benefit. *Id.*

The Trustee testified as to that benefit. Both administrative and secured creditors will be paid in full; while unsecured creditors could expect an estimated 50% distribution. Further, the latter percentage might increase depending on the outcome of the Trustee's lawsuit against the Debtor's principals. OT-1:59

---

estate under Section 541, and (2) those brought under one or more of the trustee's avoiding powers." 3 *Collier on Bankruptcy* ¶ 323.03[2] (15th ed.2015). The causes of action in this case are not derivative of the Debtor's rights: they are based on express provisions of the bankruptcy code. Chapter 5 of the Code grants the Trustee the power to avoid and recovery both preferential and fraudulent transfers for the benefit of the estate's creditors. Whether the Debtor's principals were somehow complicit in the wrongful transfers of the Debtor's stock has no bearing on whether the Trustee may avoid them. A challenge to the Trustee's standing, accordingly, would likely fail.

[4] Trustee's counsel did not opine on whether it would be difficult to collect from the defendants in the event that he obtained judgment. The stock (or its proceeds), however, is either in escrow or has been interplead.

5

*Objection*

The objecting creditors do not take issue with the amount of the recovery reached by the Trustee. OT-2:11. Rather, they object to other terms in the Settlement Agreement: specifically, the proofs of claim allowed to the Defendants; the release provisions, and the effect of the settlement on claims between the Defendants and the Debtor's Principals.

*Frorer Claim and*
*Secured Status*

The Settlement Agreement provides that Peter Frorer shall be allowed a secured claim in the amount of approximately $290,000. Settlement Agreement (SA) ¶ 3.2. The Objectors contend that there is no basis for affording the claim secured status. Obj. ¶ 49. Trustee's counsel, however, argues that Frorer's right to claim secured status had some legitimacy because he had loaned the Debtor money and because he later received a stock pledge as collateral for it. OT-1:52. To settle the case the Trustee agreed to allow the claim as secured.

*Tripartite Claim*
*and Fraud*

The Settlement Agreement provides that Tripartite shall be allowed a general unsecured claim in the amount of approximately $2.7 million. SA ¶ 3.1. The objecting creditors argue that it is improper to allow the Tripartite claim at all because it was procured through fraud. *See* Obj. ¶¶ 12-43. The claim in question represents a judgment that was entered in favor of the Commonwealth of Pennsylvania and against the Debtor and its Principals. The judgment arose from a lawsuit brought by the Attorney General. The Trustee's complaint alleged that Frorer formed Tripartite to buy the judgment from the Commonwealth at a discount. He did so, the complaint goes on,

6

with the express purpose of executing upon the Debtor's remaining asset, certain Pet360 stock. The Objectors allege that Tripartite's counsel made fraudulent representations to the Commonwealth to induce it to assign the judgment to Tripartite at a discount. Obj., ¶ 43, bullet point #3. The Commonwealth, however, has filed no objection. Moreover, the Commonwealth appeared through counsel at the settlement hearing and, although invited to weigh in, declined to suggest that anything was amiss with regard to the assignment.

Furthermore, the Trustee is in no position to collaterally attack the judgment upon which the claim is based. The judgment was entered by a state court of competent jurisdiction and, as a result, is subject to the *Rooker-Feldman* doctrine. OT-1:48. This doctrine precludes a lower federal court from acting as de facto appellate court as to a state court ruling.[5]

In sum, there is no basis on this record to deny the Tripartite claim its proposed treatment under the Settlement Agreement.

---

[5] Derived from Supreme Court precedent, *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923); *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983), the doctrine circumscribes the power of a lower federal court where its jurisdiction is concurrent with that of a state court. See 28 U.S.C. § 1257(a) (providing that federal district courts may exercise only original and not appellate jurisdiction). The Supreme Court has explained that the *Rooker-Feldman* doctrine is "confined … to cases brought by state court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280, 283 (2010). The Third Circuit has interpreted the *Exxon* holding to require four elements for the *Rooker-Feldman* doctrine to apply: (1) the federal plaintiff lost in state court; (2) the plaintiff "complain[s] of injuries caused by [the] state-court judgments"; (3) those judgments were rendered before the federal suit was filed; and (4) the plaintiff is inviting the district court to review and reject the state judgments. *Great Western Mining and Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 155, 166 (3d Cir. 2010) All four factors are present here.

*FCF Credit Claim*

The third and final claim in the Settlement Agreement to which the Objectors contest is held by FCF Credit, Inc. (FCF). That entity was formed by Mr. Frorer. The claim is based on a loan which an individual named Spangler made to the Debtor. The parties' relationship devolved into litigation over the terms of the loan. FCF purchased the loan from Spangler. Under the Settlement Agreement, the loan is to be allowed as a general unsecured claim in the amount of approximately $341,000. SA ¶ 3.3.

The objectors make two points with regard to this claim: first, that it contains an overstated interest component; and second, that it is another claim which Frorer fraudulently purchased at a discount knowing that it would increase in value after the Debtor's forthcoming merger with Petsmart. Obj. ¶¶ 44-47.

There was no evidence presented to establish that Frorer's purchase of the claim was fraudulent. As to the contention that the amount of the claim was overstated, Trustee's counsel testified that the debt was on the Debtor's books but in an amount different from the Proof of Claim. OT-1:53. The Trustee concluded that the difference between the two figures did not warrant the delay and expenditure of legal resources needed to determine the precise amount. OT-1:54, 2:38. Once again, to settle the case the figure of $341,000 was accepted by the Trustee. *Id.*

*Extent of*
*The Release*

The objectors also take issue with the breadth of the release given to the Defendants. They maintain that the release of the Defendants would potentially bar the Objectors from bringing their own claim(s) against the Defendants in the event that the

Objectors are sued by the Trustee. *See* Obj. ¶ 50. The Objectors draw this conclusion from ¶ 6.3 of the Settlement Agreement, which provides:

> the release is intended and shall be construed such that: …
> (d) the intent of this release is to relieve the Defendant Releasees, from any liability for contribution or indemnification that may arise out of any claim asserted by the Trustee against a party or parties other than the Defendant Releasees.

SA ¶ 6.3(d).

Counsel for the Trustee maintains that the Objectors misread the plain language of the foregoing text and the Court concurs. The passage provides that, if the Trustee were to successfully sue the Principals, and if the Principals then sought contribution from the Defendants, the release provision would protect the Defendants from having to again pay the amount which they already paid the Trustee. OT-2:14. It obligates the Trustee only to reduce any judgment it may obtain against the Principals to the extent necessary to satisfy a successful claim of contribution by the Principals against the Defendants. *Id.* The language clearly does not limit the Principals from proceeding against the Defendants. *Id.* The Court therefore sees no risk of prejudice being visited upon the Objectors.

*Preservation of*
*Non-debtor Claims*

The last objection to the Settlement Agreements pertains to the Defendants' claims against Fretz and Freeman. Paragraph 5 of the agreement provides that the Defendants retain their claims against those two individuals. The Objectors take issue with this provision because "all or a portion of [those claims] have been paid and [they] do not wish for the Court to give any credence to them." Obj. ¶ 53. This argument has

9

no merit. Nothing in the Settlement Agreement or the Court's order approving it affects the rights of non-debors Fretz and Freeman vis-à-vis the non-debtor Defendants. For that matter, the Settlement Agreement could not have such an effect. This Court would lack jurisdiction to hear such claims. *See Pacor v. Higgins*, 743 F.2d 984 (3d Cir. 1984)

*Summary*

      The Court finds that the Trustee has carried his burden of proof in demonstrating that the Settlement Agreement should be approved. The terms of this accord are not only within the *lowest* range of reasonableness; they arguably fall closer to its highest end. To reiterate, the estate is recovering all that the Trustee has sued for. In order to realize that benefit without undue delay and expense, modest compromise was required. That is the nature of settlements. For the creditor body as a whole, this appears to represent the best outcome under the circumstances.

      An appropriate Order follows.

By the Court:

_____
Stephen Raslavich
United States Bankruptcy Judge

Dated: <u>August 8, 2016</u>